# United States Court of Federal Claims

No. 07-854 C
TO BE PUBLISHED
(Filed under seal April 12, 2010)
(Reissued April 23, 2010)[1]

| | |
|---|---|
| FRANCES L. GREENHILL, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THE UNITED STATES, ) <br> ) <br> Defendant. ) <br> ) | Settlement agreement; employment reference; background inquiry; implied covenant of good faith and fair dealing; predicates for and calculation of expectancy damages |

Gary T. Brown, Gary T. Brown & Associates, Washington, D.C., for plaintiff. Lisa J. Brown, of counsel.

William P. Rayel, Trial Attorney, Todd M. Hughes, Deputy Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, Tony West, Assistant Attorney General, Department of Justice, Washington, D.C., for defendant.

**OPINION AND ORDER**

GEORGE W. MILLER, Judge.

Plaintiff alleges that the Department of Education ("DOE") breached a contract with her that had settled both her pending complaints with the Equal Employment Opportunity Commission ("EEOC") and a proposal to remove her from the employ of the DOE. After trial, the Court finds that the DOE did breach the contract, but that the proper measure of damages is significantly less than plaintiff contends.

---

[1] This opinion was originally filed under seal on April 12, 2010, pursuant to this Court's November 17, 2008 protective order, and the parties were given ten days to advise the court what, if any, redactions they believed were necessary before public issuance. On April 22, 2010, the parties jointly informed the Court that no redactions were required (docket entry 101). Accordingly, the Opinion and Order is released in its entirety.

**I.    Background**[2]

    *A.    DOE Employment and Settlement Agreement*

Frances Greenhill was first employed by the DOE in 1990 as an Education Support Assistant in the Office of Elementary and Secondary Education, Office of Indian Education. Defendant's Memorandum of Contentions of Fact and Law ("Def.'s Memo") at 2 (docket entry 62, Aug. 14, 2009); Plaintiff's Memorandum of Contentions of Fact and Law ("Pl.'s Memo") at 1 (docket entry 56, July 30, 2009). During her federal employment, Ms. Greenhill received superior and fully satisfactory annual evaluations, including bonuses and cash awards. Trial Transcript at 394 (docket entries 81, 83 & 85, Oct. 7, 2009) ("Tr."). Utilizing DOE's partial tuition reimbursement, Ms. Greenhill pursued a college degree, eventually reaching the senior level. Pl.'s Memo at 1; Tr. at 395.

When Ms. Greenhill transferred into a new section, "troubles developed with her supervisor." Pl.'s Memo at 1. Specifically, Ms. Greenhill had been asked to answer calls from approximately 1,500 school districts on a 1-800 line regarding grant applications. Tr. at 398-99. This created problems for Ms. Greenhill, including causing a flare-up of her mental health condition (bipolar disorder) and friction with her then-supervisor, Cathy Martin. Tr. at 399-400. Ms. Greenhill saw her doctor, who recommended that she not answer the 1-800 line and that Cathy Martin no longer supervise her. Tr. at 398-400.

Ms. Greenhill was then placed under the supervision of Mary Brayboy. Ms. Greenhill testified that she was not notified about being denied a within-grade pay increase in 1998, and "was in tears" when she received a proposal to remove her from her job instigated by Ms. Brayboy. Tr. at 401. Ms. Greenhill came to believe that the allegations of unsatisfactory performance by Ms. Brayboy and Cathy Martin were based on Ms. Greenhill's race and mental health disability, and she therefore filed multiple complaints with the DOE's EEO office. Pl.'s Memo at 2; Def.'s Memo at 2.

An attorney in the DOE's Office of General Counsel, Daria Stec, reviewed the proposal to remove, and with the assistance of an EEOC mediator, ultimately negotiated a settlement

---

[2] This recitation of facts sets forth certain of the Court's findings of fact in accordance with Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC"). Additional findings of fact and rulings on mixed questions of fact and law are set forth in later sections of this Opinion and Order. In this section, the Court summarizes necessary background facts relevant to the subject of this opinion. For a more complete account of the background facts and procedural history of this case, the reader is referred to *Greenhill v. United States*, 81 Fed. Cl. 786 (2008), which denied defendant's motion to dismiss.

between DOE and Ms. Greenhill.[3] Tr. at 40-41.  The parties agreed that the settlement agreement had been "entered into in good faith by the parties to avoid unnecessary litigation and to encourage fair and speedy resolution of the issues."  Joint Exhibit ("JX") 9 at 3.

In the settlement, Ms. Greenhill gave up her position at DOE and promised not to reapply for work at DOE.  In exchange, the DOE paid Ms. Greenhill $90,000, gave her a within-grade increase to GS-7, Step 7 and associated back pay, and gave her a rating of "pass" for her final evaluation.  Pl.'s Memo at 2; Def.'s Memo at 2; JX 9.  The Government also promised to remove the proposal to remove and other documents related to it from "all personnel files and records that may be maintained" in the Office of Elementary and Secondary Education ("OESE").  JX 9 at 2.  DOE was not required to remove these documents from files maintained by the DOE's Office of Inspector General, EEO Group or Office of General Counsel.  *Id.* at 2-3.  Moreover, DOE was permitted to release information from those records in response to requests of "Governmental agencies . . . for purposes of conducting any type of security, suitability or background inquiry" regarding Ms. Greenhill.  *Id.* at 3.

The settlement agreement also provided that all future requests for "employment references" for Ms. Greenhill would be referred to an employee in DOE's personnel office named Joyce Boykin.  Ms. Boykin was to respond only that Ms. Greenhill "resigned effective [date of Complainant's written resignation and reason]" and verify the dates of employment, salary, GS-level, title, and performance ratings.  *Id.* at 2.

If Ms. Greenhill believed that the agreement had been breached, the settlement agreement instructed her to "notify the Department's EEO Director in writing within thirty (30) calendar days of the date [she] knew . . . of the alleged non-compliance."  *Id.* at 4.  The claim would "be processed as set forth in 29 C.F.R. § 1614.504 and [could] result in: compliance by the Department; rejection of the claim; an EEOC order that the Department comply with the Agreement; or reinstatement of the above-captioned EEO complaint for further processing from the point processing ceased under the terms of this Agreement."  *Id.*  If Ms. Greenhill's EEO complaints were reinstated, she would "be responsible for the return of all benefits . . . that she has obtained under this Agreement."  *Id.*

Daria Stec sent a memo to DOE employees in the OESE, Office of Management, Human Resources Group, EEO Group, and the Office of Inspector General, attaching the settlement agreement, requesting that each office implement the relevant provisions, and directing any questions to Laura Kipp in the OESE.  Defendant's Exhibit ("DX") 2.  Ms. Greenhill in fact resigned from her position at DOE on November 30, 1999.  JX 8.

---

[3] Ms. Greenhill erroneously believed that the settlement agreement would result in her receiving a position at the Department of Health and Human Services, which she attributes to being "a little misguided" by her attorney.  Tr. at 403.

B.   *Application to Department of Justice*

Sometime in late 2001, Ms. Greenhill applied for a secretarial position with the United States Department of Justice, Civil Division, Commercial Litigation Branch, Frauds Section. Def.'s Memo at 3; Tr. at 404. Ms. Greenhill successfully interviewed with DOJ secretarial supervisor Julia Jackson and was tentatively offered a GS-5 Secretary position, pending a background investigation by the Office of Personnel Management. Def.'s Memo at 3; Pl's Memo at 3; Tr. at 405.

Ms. Jackson testified that after she made an initial selection of an employee such as Ms. Greenhill, she "sent the paperwork to personnel," and they would "call the references, they do the background and then they come back to me." Tr. at 122. At that time, personnel called both personal references and previous supervisors. *Id.* at 133, 137-39.

Because the DOJ job was a "public trust position,"[4] Ms. Greenhill submitted a Standard Form 85, Questionnaire for Public Trust Positions ("SF-85P") to the Personnel Management Branch. Tr. at 406-07. Ms. Jackson advised Ms. Greenhill that in order to pass the background check she needed to fill out the SF-85P correctly and that she had to get her "credit together." Tr. at 405; *see also* Tr. at 133.

Ms. Greenhill submitted one set of forms, which were rejected because they were missing information, and had data written in the margins, crossovers, and whiteouts.[5] Tr. at 633-34; *id.* at 406-07; Plaintiff's Exhibit ("PX") 7. In the first version of the paperwork, in response to a question asking whether the applicant had seen a physician regarding mental health issues in the preceding seven years, Ms. Greenhill had answered "yes." Tr. at 636-37. In the second version, she answered "no." *Id.* The fact that "at least one answer had been changed when she redid the form . . . would be a security concern," *id.* at 664, although DOJ Human Resources Specialist Donna Cornett took the denial on the second form to be an error. *Id.* at 675. Ms. Greenhill testified that she answered "no" because although she had been seeing a doctor in 1998 before

---

[4] Public trust positions "involve policy-making, major program responsibility, public safety and health, law enforcement duties, fiduciary responsibilities or other duties demanding a significant degree of public trust, and positions involving access to or operation or control of financial records, with a significant risk for causing damage or realizing personal gain." 5 C.F.R. § 731.106(b). Due to these significant responsibilities, such employees must complete a Form SF-85P and pass a background check before their employment.

[5] Donna Cornett of Human Resources testified that this "obvious difficulty in completing the forms," including following the directions regarding complete information and no white-outs implicated Ms. Greenhill's suitability for a "secretarial position which would require some degree of accuracy." Tr. at 664. Moreover, there was some concern "that she had been sort of less than professional in her dealings or the impression that she had left." *Id.* at 677.

4

she left DOE, "[w]hen I lost my job at the Department of Justice and my permanent job at the Department of Education, I lost my medical insurance, so I wasn't able to go to a doctor." *Id.* at 482.

On both forms, Ms. Greenhill answered "no" to question 12, which asked whether the employee had left a position by mutual agreement following allegations of unsatisfactory performance. Tr. at 698-99; JX 10. When asked why she selected "no," Ms. Greenhill answered "because we had a settlement agreement." Tr. at 477.

In the final version of her SF-85P, Ms. Greenhill listed Mary Brayboy as her most recent supervisor at DOE. Def.'s Memo at 4; JX 10 at 4. The Personnel Management Branch contacted the people Ms. Greenhill had listed on her SF-85P in an effort to get a waiver from the DOJ's Office of Security that would allow DOJ to hire Ms. Greenhill prior to the completion of the Office of Personnel Management background check. Def.'s Memo at 4; Tr. at 627.

On May 20, 2002, Nichole Covington, a student intern in the Personnel Management Branch, spoke with Ms. Brayboy in a process that human resources called "vouchering." On a form titled "Inquiry Regarding Suitability of Applicant," Ms. Covington recorded Ms. Brayboy's response to specified questions. Although "Ms. Brayboy did not feel comfortable answering questions 1-6," she did answer when asked whether Ms. Greenhill was eligible to be rehired by DOE. JX11. Ms. Brayboy reported that Ms. Greenhill was not eligible for rehire "[b]ecause her performance was not at the level it should have been. There were a lot of confrontations with this employee. The situation is very complex[.] Ms. Greenhill had made an agreement with the Dept. of Education not to apply for another Federal job. There is not any paper work on that, but I do know that she did sign something saying that she would not apply for any federal job. If . . . I had an opportunity to choose her again I would not choose her . . . . She was fired by the Department of Education." *Id.*

It is undisputed that several of Mary Brayboy's assertions were not correct. For example, Ms. Greenhill was not fired, nor did she sign anything agreeing never to apply for a job with the federal government. Nonetheless, these answers prompted Ms. Cornett to request Ms. Greenhill's Official Personnel Folder ("OPF"). Tr. at 644. The OPF would ordinarily have been checked during the investigation process, "but not in this timely a manner." *Id.* When Ms. Cornett reviewed the OPF, she noted that there was no indication Ms. Greenhill had been fired. Tr. at 648. She also observed that the Standard Form 50s indicating changes in Ms. Greenhill's step and salary had been amended using whiteout. Tr. at 634, 649-50. This indicated "that something had happened to change the course of events for these actions, that they weren't the same as what they initially had been." Tr. at 650. She also saw that an SF-50 for a within-grade increase effective August 30, 1998 was dated as signed more than a year after the effective date. Tr. at 652, 655.[6]

---

[6] Ms. Cornett testified that "If I were the one deciding, I'd have the personnel action hand typed cleanly," although the within-grade increase would still be dated a year after the effective

5

These documents indicated that "while it didn't appear that Ms. Greenhill had been fired, it wasn't too far out of line with what the official personnel folder indicated, that there were employment difficulties . . . at the Department of Education." Tr. at 656. In Ms. Cornett's experience, alterations to forms such as these occurred where "[t]here had been a settlement agreement where something had happened after the fact where it was agreed that the salaries would have been changed." Tr. at 650. There was no document recording a denial of a within-grade increase in the file Ms. Cornett reviewed.

Human Resources contacted Ms. Jackson, the DOJ selecting official, and recommended that she not hire Ms. Greenhill because Ms. Jackson had "enough problems already." Tr. at 124. Based upon the information she had obtained, Ms. Cornett drafted a letter to Ms. Greenhill withdrawing the job offer, which was sent on June 21, 2002. JX 12; Tr. at 657. The letter stated that "a reference response from the Department of Education . . . raised questions concerning your prior employment." JX 12 at 1.[7] Ms. Brayboy's statements were read to Ms. Greenhill over the phone, and she was "disappointed and upset." Tr. at 660.

    C.    *EEO Complaint*

Shortly after she received the June 21, 2002 letter, Ms. Greenhill went to DOE's EEO office to complain that DOE had not complied with the settlement agreement. Pl.'s Memo at 4; Def.'s Memo at 5; Tr. at 411. Ms. Greenhill spoke to DOE Equal Employment Specialist Cathy Hawkins, although their memories of this encounter differ somewhat. According to Ms. Greenhill, she did not have the settlement agreement itself because it had been placed in storage due to a recent move. Tr. at 411-12. She testified that she asked security to call Ms. Hawkins downstairs, and Ms. Hawkins came and provided Ms. Greenhill a copy of her settlement agreement. Tr. at 412. Ms. Greenhill then showed Ms. Hawkins a copy of the letter from DOJ and "asked her what went wrong with our settlement agreement." Tr. at 412. In Ms. Greenhill's account, Ms. Hawkins read the letter and gave it back to Ms. Greenhill, but "didn't say anything. She just went back upstairs, there was no discussion."[8] Tr. at 412.

Ms. Hawkins testified that she and Ms. Greenhill "ran into each other in the lobby" when Ms. Hawkins was on her way out to lunch. Tr. at 507. Ms. Hawkins asked Ms. Greenhill if she could see the agreement, which Ms. Greenhill provided. Tr. at 507-08. Ms. Hawkins noted the provision that at the end of the agreement stating that any allegation of breach had to be in

---

date. Tr. at 684-85.

    [7] Ms. Cornett used the term "reference response" because she assumed Ms. Greenhill "wouldn't know what a voucher was." Tr. at 661.

    [8] Plaintiff previously argued that when she visited the EEO office in July of 2002, that visit created an "affirmative duty" on the part of DOE to "review its obligations pursuant to the contract." Pl.'s Memo at 9. This contention appears to have been abandoned.

6

writing, and advised Ms. Greenhill that she needed to provide a written complaint. Tr. at 508. Ms. Hawkins specifically remembered Ms. Greenhill responding "Oh, I can do that." Tr. at 508.

There is no dispute that this meeting was within the time limit for registering a complaint with the EEO office, nor that at the end of the meeting Ms. Greenhill had a copy of her settlement agreement. Ms. Greenhill's testimony did not evince any promise by Cathy Hawkins to take any action in furtherance of her complaint (nor, of course, did Ms. Hawkins's).

Ms. Greenhill testified that she "was devastated because, not having a job, having to take care of my family, and not knowing—because I had never had an out-of-court settlement agreement. And then to get an out-of-court settlement agreement and then to have the settlement breached, I didn't know what to do. And nobody really assisted me, so I said, well I'll go to my Congressman Albert Wynn, and Albert Wynn assisted me." Tr. at 413-14. She stated that although she did review the settlement agreement "but I don't know I was just not focused, because I was going through too many things at one time" and "I couldn't figure it out" and "I didn't know what to do." Tr. at 414-15. Albert Wynn "told me to put the letter in writing, he, you know, refocused me." Tr. at 415.

On July 30, 2003—more than a year after the DOJ letter—Ms. Greenhill sent a letter to the EEO office informing it about the alleged breach of the settlement agreement. JX 13. Ms. Hawkins informed the EEO Director, James White, that Ms. Greenhill had been into the office "early on" regarding her complaint but had not submitted anything in writing. Tr. at 511. Ms. Hawkins called Ms. Greenhill to inquire why the complaint was so late, and Ms. Greenhill indicated that she was very upset and depressed and had to look for another job. PX5. The EEO office asked Ms. Greenhill to submit documentation to support her allegations, and on September 24, 2003 she did so. *Id.*

On October 9, 2003, the EEO office requested Ms. Greenhill's OPF, *id.*, and on October 17, 2003, Ms. Hawkins signed a letter to Ms. Greenhill on behalf of Mr. White indicating that Betty Morton had been assigned to look into Ms. Greenhill's allegations. JX 14. The letter noted that her request was untimely, but stated that "we will review her OPF to see if her file needs to be expunged." PX5.

Ms. Morton contacted an employee at the Department of Justice, who provided her a copy of the "Inquiry Regarding Suitability of Applicant" reflecting Ms. Brayboy's comments. Tr. at 159-60. Ms. Morton believed that this appeared to be a breach of the contract, but she was only "collect[ing] the evidence or information to determine if it should go to Investigation or should be dismissed." Tr. at 167. Ms. Morton also reviewed Ms. Greenhill's OPF, but did not note any documents or codes that violated the settlement agreement. Tr. at 202-04.

The employees in the EEO Office at the DOE held inconsistent beliefs regarding the usual course of action when they received an untimely complaint. Former EEO Specialist Robert Kilpatrick stated that "[o]rdinarily if a complaint is not timely filed our office would waive that

and send the person a letter indicating that their complaint has been accepted."[9]  Tr. at 238-39.  Ms. Hawkins, however, disagreed because she believed waiving the timeliness requirement set a bad precedent: "The regulations say that you are supposed to file timely complaints, and if a legitimate reason is not given for waiving the complaint, then you shouldn't."  Tr. at 517.

In any event, on July 1, 2004, a day when Mr. Kilpatrick was the Acting Director due to Mr. White's absence from the office, Mr. Kilpatrick signed a letter accepting Ms. Greenhill's untimely complaint for processing by Investigation.  JX15.  Ms. Morton indicated that this decision put Director James White "in the hot seat" with his superiors, Tr. at 173-74, although Mr. Kilpatrick said he had never heard Mr. White criticize the decision to waive the timing requirement.  Tr. at 367.  On August 17, 2004, however, the EEO office issued a letter rescinding what it characterized as its mistaken acceptance of Ms. Greenhill's untimely complaint.  JX 16.  This decision was affirmed by the Equal Employment Opportunity Commission on February 14, 2005.  *Greenhill v. Spellings*, Appeal No. 01A45669, 2005 WL 433074 (EEOC Feb. 14, 2005).  The EEOC notice informing Ms. Greenhill of its decision included a statement of plaintiff's right to sue in district court.  *Id.* at *2.

On June 2, 2005, Ms. Greenhill sued in the United States District Court for the District of Columbia seeking $210,000 in damages, reinstatement of employment, restoration of Federal employment benefits and other miscellaneous relief.  Def.'s Memo at 5.  On December 22, 2005, the district court dismissed Ms. Greenhill's complaint for lack of jurisdiction, holding that her claim was a contract claim for more than $10,000 that must be heard in this court.  *Greenhill v. Spellings*, No. 05-1100, 2005 WL 3508653 (D.D.C. Dec. 22, 2005).  That decision was upheld on appeal, but remanded with instructions to transfer the case to this court.  Def.'s Memo at 6; *Greenhill v. Spellings*, 482 F.3d 569, 576 (D.C. Cir. 2007).  The case was transferred to this court in July of 2007, and Ms. Greenhill filed her transfer complaint on January 2, 2008.  Compl. (docket entry 3, Jan. 2, 2008); *see* RCFC 3.1.  Trial was held on September 8, 9 and 10, 2009.

**II.    Discussion**

Plaintiff contends that the Government breached the settlement agreement in three ways: (1) that Mary Brayboy provided a negative employment reference to the DOJ as a prospective employer in violation of the specific terms of the contract; (2) that information regarding the denial of a within-grade increase remains in her personnel files in derogation of the agreement; and (3) that the DOE's decision to rescind Mr. Kilpatrick's waiver of the time limit for appeal breached the implied covenant of good faith and fair dealing.  The Court concludes that Mary

---

[9]  Mr. Kilpatrick has filed a number of EEO complaints against the federal government, and the defendant was at some pains to indicate the potential bias in his testimony in favor of EEO complainants.  Mr. Kilpatrick, who held a law degree, was of the very firm opinion that the general counsel's office was unfavorable to EEO complainants.  Tr. at 348 ("I chose not to work in the General Counsel's office because they never did what was right, so I preferred to do what was right with respect to complainant[s].").

Brayboy's actions breached the settlement agreement, but that the remaining allegations lack merit.

> A.   The United States Provided Erroneous and Derogatory Information to a Prospective Employer In Breach of the Settlement Agreement

To establish a breach of contract, the plaintiff must show the existence of a contract, an obligation or duty arising out of that contract, a breach of the duty, and damages caused by the breach. *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). Defendant concedes the existence of a contract and obligations and duties arising out of that contract. It defines those duties differently from plaintiff, however, and thus contends that the DOE did not breach its obligations and therefore there is no compensable damage to plaintiff. Def.'s Memo at 7.

The Federal Circuit has frequently pointed out the problems created by "neutral reference" settlement agreements such as the one at issue here. A sophisticated prospective employer will pick up on the "subtle signal . . . that there is some undisclosed problem, in which case the employee has been misled into believing he is getting something he is not," namely the absence of any indications of problems in his prior employment. *Holmes v. Dep't of Veterans Affairs*, 58 F.3d 628, 634 (Fed. Cir. 1995) (Plager, J., concurring). On the other hand, "a 'neutral' reference . . . is not an honest reference" and is "deliberately misleading" to a less knowledgeable prospective employer. *Id.* ("[T]he practice of one government agency palming off an unacceptable employee on another government agency by withholding material evidence concerning the employee's conduct hardly serves the public interest."). Thus, the appeals court has observed:

> It may well be that it is virtually impossible for agencies to ensure that settlement agreements such as this, requiring the whitewashing of an employee's disciplinary record, can be performed to the letter. Even if some agency officials are willing to palm off their problems on others, including sister agencies, without revealing the truth about an employee, there is always the risk that another person who knows the facts will not remain silent. Perhaps as a matter of sound governmental administration such agency agreements should be prohibited.

*Thomas v. Dep't of Hous. & Urban Dev.*, 124 F.3d 1439, 1442 (Fed. Cir. 1997). Such agreements "invite trouble," and "[t]his case is simply another example of how unsatisfactory these agreements may turn out to be." *Pagan v. Dep't of Veterans Affairs*, 170 F.3d 1368, 1372 (Fed. Cir. 1999); *see also Godwin v. Dep't of Defense*, 228 F.3d 1332, 1338 (Fed. Cir. 2000) ("We emphasize once again our discomfort with agreements of the sort at issue in this case. They seem almost bound to lead to mischief.").

To the extent that the Government chooses to enter into such an agreement, however, the court will not "condone what would be essentially an empty promise made by the government"

9

by finding an agency not responsible for a "leak . . . directly from a responsible official inside the agency in response to an inevitable inquiry from a potential employer." *Thomas*, 124 F.3d at 1442. The agency may not use these agreements as a "trap for an uninformed or unwary employee." *Pagan*, 170 F.3d at 1372. Because the "agency is in a better position to know and appreciate the potential problems" with these agreements, "at a minimum the agency has the responsibility to ensure that the employee understands the problems, and that the agreement adequately addresses them." *Id.*

The interpretation of a settlement agreement is a question of law. *See Mays v. United States Postal Serv.*, 995 F.2d 1056, 1059 (Fed. Cir. 1993) ("The settlement agreement is a contract, of course, and its interpretation is a matter of law."). If the settlement agreement has a clear meaning that the parties understand, "it is enforced according to its terms." *Pagan*, 170 F.3d at 1371. But if the Court finds an ambiguity, then it must "implement the intent of the parties at the time the agreement was made." *Id.*

The parties vigorously dispute whether the alleged breach by Mary Brayboy is governed by paragraph 2(b) or paragraph 11 of the settlement agreement. Paragraph 2(b) indicated the Government's commitment to "refer all requests for employment references on Complainant to Joyce Boykin . . . . The response to such requests shall be limited to stating that Complainant 'resigned effective [date of Complainant's written resignation and reason],' and verifying the dates of employment, Complainant's salary, GS-level, title, and performance ratings contained in Complainant's Employee Performance Folder (EPF)." JX 9 at 2.

Paragraph 11 stated that the parties agreed "that the Department's official records of this matter will be maintained in accordance with applicable U.S. Government and Departmental records retention and disposition schedules." *Id.* at 3. These official records included those files maintained at the DOE's Office of Inspector General, in the DOE's Employee Relations Group, and the DOE's EEO Group, along with litigation files in the Office of General Counsel. *Id.* The agreement provides that

> All such files will reflect the disposition of this case through settlement. The parties agree and understand that this Agreement in no way restricts or inhibits the Department from releasing any such information from such records, or the records themselves, where such release is legally required or allowed for Governmental purposes, is required by subpoena or court papers in the nature of subpoenas, is in response to requests of Congress and/or Governmental investigative agencies, such as an Office of Inspector General or the Office of Personnel Management, or is in response to requests of other Governmental agencies, or persons/entities who have the delegated authority, *for purposes of conducting any type of security, suitability, or background inquiry relating to Complainant.*

*Id.* (emphasis added). Prior to closing arguments, the Government contended that the inquiry to which Ms. Brayboy responded was a "security, suitability or background inquiry" within the

meaning of Paragraph 11, and that such an inquiry was completely distinct from an employment reference. Defendant's Proposed Findings of Fact and Conclusions of Law at 14 (docket entry 90, Dec. 10, 2009) ("Def.'s Proposed Findings") ("A 'security, suitability or background inquiry,' however, cannot be the same as an 'employment reference' . . . ."). That is, the Government argued that the "vouchering" process conducted by Nichole Covington was a "security, suitability or background inquiry" rather than an "employment reference." The testimony at trial, however, did not support the Government's theory.

Ms. Stec, drafter of the agreement, indicated her belief in the difference between a background inquiry and an employment reference, but she was not aware that anyone informed supervisors that the agreement defined two different types of inquiries. Tr. at 57-58. Despite this lack of definition, she testified that it was the duty of the person who received an inquiry to decide what level of inquiry was occurring, and to check with personnel if they had doubts about whether to respond. *Id.* ("[S]upervisors would be aware that if they received an employment reference that they should not say anything and go to Joyce Boykin."). Ms. Stec also stated that questions about quality of performance would be a "general employment verification-type inquir[y]" like a reference rather than a background inquiry, which would address matters such as loyalty to the Government. Tr. at 85-86.

DOJ witness Julia Jackson repeatedly referred to all of the calls made by the personnel office, which included both personal and employment references, as "references." Tr. at 122, 133. As the selecting official for DOJ, she did not call previous supervisors or personal references, but entrusted all of that to the personnel department. Tr. at 138. Thus, if employment references were ever checked for DOJ employees, it was by action of the personnel office, whether denominated "reference checking" or "background inquiry."

DOE Equal Opportunity Specialist Betty Morton testified that a suitability determination is "[t]he same as a reference for a job, to determine if you're eligible for the job. Regardless of what you call it, I still look at it as employment for the job." Tr. at 209. Furthermore, she believed "[i]t was clear in her settlement agreement that Joyce Boykin would be the main contact" and that in other cases managers receiving calls would refer the inquiry to the designated point of contact. Tr. at 166. Mr. Kilpatrick likewise testified that he based his belief a breach had occurred on the fact that "[h]er supervisor is the one who had provided information that should have come from the personnel office." Tr. at 253.

Even witnesses called by the Government undermined the drawing of this very fine line. Ms. Pamela Diatillio, who is an associate director for personnel security at the Department of Transportation, testified that the background check of Ms. Greenhill with respect to her job with a contractor to the Federal Railroad Administration within the Department of Transportation was "a very low-level type of background investigation that was conducted. There is information provided back to us through the background investigation related to *employment references*, employment records, sometimes acquaintances." Tr. at 567-68 (emphasis added). The background check is done "in the *form of a voucher*, a piece of paper that would be mailed to a

former employer or mailed to a *former employment reference*." Tr. at 568 (emphasis added). She further testified that "*[a]n employment reference is part of every background investigation*," and "'[a]n employment reference is someone who can attest to an individual's knowledge of an individual's performance while employed with a particular company or agency." Tr. at 572 (emphasis added).

Government witness and background investigator Donna Cornett did testify directly that "vouchering" is not the same as obtaining an employment reference. Tr. at 661-62. But when she was not responding to that specific question, her use of the terminology was likewise inconsistent. She said a reference check is "kind of a universal concept in the government and private sector where the supervisor is talking to references or former supervisors to determine whether that person is a good match for that position, what the background has been." Tr. at 618. When she conducts an initial inquiry into an applicant's background, some of the issues that would cause her to decline to issue a waiver of the full background check were "drug use, a criminal background, *information could have been obtained when interviewing references or supervisors* that there was negative information." Tr. at 626-27 (emphasis added). After vouchering, she testified that OPM will go out and interview the former supervisors and references. Tr. at 670. It appeared that Ms. Cornett generally used the term "reference" to include interviews of former supervisors regarding performance as part of a background check.

Most significantly, Ms. Cornett testified that she used the term "reference response" in the paragraph of the letter withdrawing the job application because she didn't think Ms. Greenhill would "know what a voucher was." Tr. at 661. The testimony at trial supported a finding that if there is a substantive difference between an employment reference and a background check, questions regarding performance at a prior job would constitute an employment reference, while questions about loyalty to the Government are included in a background check.

At oral argument, defendant abandoned its claim that there was a substantive distinction between an employment reference and a background check, instead contending that the difference between the two was the *timing* of the inquiry. Transcript of Closing Arguments at 30 (docket entry 98, Feb. 18, 2010) ("Oral Arg. Tr."). That is, the Government admitted that "[t]here is no dichotomy between the type of information in an employment reference and the type of information that would go into a background investigation." Oral Arg. Tr. at 35. This is consistent with Ms. Diatillio's testimony that an employment reference is conducted as part of a background investigation; the questions asked in both circumstances are the same. The Government thus confessed that Ms. Brayboy provided the information pertinent to an "employment reference" within the meaning of the contract, but relies wholly on *when* she made the statement in asserting that no breach occurred.

Defendant now argues that after Ms. Greenhill was tentatively selected for the DOJ position, but before she was hired, the Government was no longer bound by the "employment reference" provisions of the settlement agreement, but could ask anyone anything it wished as part of a "background check." There are several problems with this argument. Ms. Cornett, the

Government's own witness, interpreted the word "reference" as the ordinary language synonym for the employment specialist's term "voucher." The contract must be interpreted as the parties understood it, and the Government knew that Ms. Greenhill would not understand the word "reference" as synonymous with the word "vouchering." That is, if the word "reference" is capable of two interpretations, one of which plaintiff could not reasonably be expected to understand, then Ms. Stec, who drafted the contract, would have had to include much clearer language to create such a fine distinction. *See Veit & Co., Inc. v. United States*, 56 Fed. Cl. 30, 35 (2003). Given the Government's obligation "to ensure that the employee understands" these problematic agreements, *Pagan*, 170 F.3d at 1372, it would be unreasonable to interpret the word "reference" in the contract to mean something the Government itself did not believe plaintiff would understand.

This Court seeks to "effectuate [the] spirit and purpose" of a contract. *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (quoting *Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978)); *see also Hercules, Inc. v. United States*, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002). "[A]n interpretation which gives a reasonable meaning to all parts," of the contract "will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona,* 575 F.2d at 863; *see also Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed. Cir. 1985); *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 729-30 (2004).

The Government seeks the "weird and whimsical result" that Ms. Greenhill was only protected by her settlement agreement up until the point where she was tentatively selected for a federal position. After that point, Mary Brayboy, whom Ms. Greenhill had accused of lying about her in the past, was perfectly permitted to further spread those alleged untruths. The Government would create a purgatory after selection and before hiring where it need not comply with its contractual obligations. That cannot be right. Nor does the Government's argument grapple with the testimony solicited by and for the defendant that "[a]n employment reference is part of every background investigation." Tr. at 572. If, as defendant's witness testified, employment references are conducted during background investigations, then both the substance *and* the timing of these two events would overlap. Mary Brayboy's responses would, on that reading, be considered an employment reference and have breached the contract.

The Court therefore finds that the inquiry conducted by Nichole Covington was an "employment reference" within the meaning of paragraph 2(b) of the agreement. Even if this contract were ambiguous, the intent of the parties in drafting paragraph 2(b)—the very thing that the paragraph was designed to prevent—was Mary Brayboy hindering Ms. Greenhill's prospects of future employment. That was the "spirit and purpose" of the contract. It is true that some (accurate) portions of the information provided were in files available to the background investigators and might eventually have been discovered. That does not excuse the breach.[10]

---

[10] Defendant contends that there is a public interest exception allowing disclosure of certain information regarding potential "public trust employees" even when that disclosure is

Even if Mary Brayboy's comments had not literally breached the contract, the Government would nonetheless be liable for a breach of the implied covenant of good faith and fair dealing. Ms. Brayboy's recorded statements make clear that she knew about the existence and terms of the settlement agreement. She therefore knew that reference checks were supposed to go to Joyce Boykin. Her refusal to answer questions one through six indicates both that Ms. Brayboy believed the settlement agreement applied to Ms. Covington's questions and that she was not supposed to be giving out information. Ms. Brayboy's decision to answer anyway thus "destroy[ed] the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States,* 395 F.3d 1283, 1304 (Fed. Cir. 2005). That is, Ms. Brayboy performed "the old bait-and-switch" by implicitly acknowledging that she knew she was bound by a contract that provided Ms. Greenhill "a significant benefit in exchange for consideration" but nonetheless took "a subsequent action directed at the existing contract" that was "specifically designed to reappropriate the benefits" Ms. Greenhill "expected to obtain from the transaction." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 829 (Fed. Cir. 2010).

Ms. Greenhill expected that as a result of the contract Mary Brayboy would not be able to interfere with her future employment. Those expectations were destroyed when Ms. Brayboy decided to give out information covered by the agreement along with some inaccurate information, even if the conversation had not been an "employment reference." WILLISTON ON CONTRACTS § 63:22 ("[A] party who evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party . . . may be liable for breach of the implied covenant of good faith and fair dealing.") (citation and quotations omitted).

---

prohibited by a settlement agreement. That is true, but beside the point. The public interest exception applies where (1) the conduct in question was criminal and (2) the information disclosed was true. *Fomby-Denson v. Dep't of the Army*, 247 F.3d 1366, 1378 (Fed. Cir. 2001) (holding it was not a breach of settlement agreement to refer possible crime to enforcement authorities); *Gizzarelli v. Dep't of the Army*, 90 M.S.P.R. 269, 280 (M.S.P.B. 2001) (finding no breach of settlement agreement in providing information from crime records center regarding theft of government property); *Holloman v. Stone*, No. 01911399, 1991 WL 1186520 (EEOC July 16, 1991) (concluding no breach settlement agreement occurred in revealing to security clearance investigator that employee had been terminated for stealing). Neither applies here. The public interest exception "does not apply to information, such as was disclosed in the instant case, about performance or non-criminal conduct issues." *Cunningham v. Office of Personnel Mgmt.*, 110 M.S.P.R. 389, 396 (M.S.P.B. 2009) (citing *Pagan*, 170 F.3d 1368; *King v. Dep't of the Navy*, 130 F.3d 1031 (Fed. Cir. 1997); *Thomas v. Dep't of Hous. & Urban Dev.*, 124 F.3d 1439 (Fed. Cir. 1997); *Gizzarelli*, 90 M.S.P.R. 269, ¶ 23). Moreover, the exception certainly does not authorize disclosure of inaccurate information.

14

### B. *Ms. Greenhill Has Not Established that the United States Breached Paragraph 2(a) of the Settlement Agreement*

The settlement agreement explicitly promises that "the Proposal to Remove and any other documents relating to it" will be deleted from "personnel files and records that may be maintained in the Office of Elementary and Secondary Education (OESE)" but that those documents would continue to exist in other files and would be available to, for example, the Office of Personnel Management in conducting "any type of security, suitability or background inquiry relating to Complainant." JX 9 at 2, 3.

There was no evidence that the proposal to remove or any document "relating to it"—including any denial of a within-grade increase—remained in any personnel file maintained in the OESE. *Cf. Priselac v. Dep't of the Navy*, No. 98-3007, 1999 WL 55521 (Fed. Cir. Feb. 5, 1999) (concluding promise to remove all references to proposed removal did not include Notification of Personnel Action denying within-grade increase). Ms. Cornett testified that there was nothing in the file about the proposal to remove. She inferred, as an educated insider reading the file, that the documents had been changed in a manner that suggested an initial denial of a within-grade increase that had later been retroactively granted. While the use of white-out might not have been the best of all possible practices, it did not breach the settlement agreement. When Betty Morton reviewed the file, she likewise found no impropriety. Ms. Greenhill based her belief that there were documents in her file solely on the letter she received from DOJ; there has subsequently been no showing that any such documents exist. Therefore, Ms. Greenhill has not established that the United States breached paragraph 2(a) of the settlement agreement.

### C. *Plaintiff Failed to Show That The United States Breached the Implied Covenant of Good Faith And Fair Dealing in Handling Plaintiff's Breach Complaint*

Plaintiff asserts that defendant acted in "bad faith" when it rescinded its acceptance of her untimely complaint regarding the breach. Plaintiff Greenhill's Closing Statement at 13 (docket entry 91-1, Dec. 14, 2009). Defendant argues that this Court lacks jurisdiction over such a claim, because the only appeal from the dismissal of her claim was to the EEOC. That appeal has been taken and denied, precluding the relitigation of the issue pursuant to *res judicata*. Def.'s Proposed Findings at 20-25. The Court is inclined to agree, but will also note that the implied covenant of good faith and fair dealing must attach to a specific contractual obligation. *Franklin Sav. Corp. v. United States*, 56 Fed. Cl. 720, 743 (2003). The plaintiff may not now go back and insert new terms into the contract. *Id.* at 744. The contract states that, to receive the equitable remedies of specific performance or reinstatement of her EEO complaint, Ms. Greenhill had to file a complaint in writing with the DOE EEO Director within 30 days of learning about the breach. JX9 at 4. She did not do so; now those remedies are unavailable to her. Plaintiff alleges that defendant acted in bad faith merely by holding her to her bargain. The Government had no intent to deprive plaintiff of her contractual rights; it merely asserted its own rights under the agreement, namely, to refuse to accept a non-compliant filing. There is no impropriety in that decision, even if it were not precluded by its previous adjudication.

      D.      *The Government's Breach Caused Expectation Damages in the Amount of $ 3,948*

To recover damages, plaintiff must (1) show that her damages were reasonably foreseeable by the Government at the time of contracting; (2) prove that the breach was a substantial causal factor of her damages; and (3) demonstrate the quantum of damages with reasonable certainty. *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005). Even when a breach of contract is proven, a plaintiff will receive no award if it fails to prove that the breach caused foreseeable damages of a reasonably certain amount. *Citizens Fin. Servs. v. United States*, 64 Fed. Cl. 498, 510-11 (2005).

      1.      <u>Plaintiff Cannot Recover Damages on the Principal Theory She Has Espoused</u>

Ms. Greenhill's principal theory of damages is that she is entitled to "partially rescind" the settlement agreement, be reinstated to her job at DOE, and receive back pay as if she had been working there since 1999. But the Court lacks jurisdiction to award the equitable remedy of rescission and reinstatement. The only remedy available here is traditional contract damages for breach. 28 U.S.C. § 1491(a)(2); *Taylor v. United States*, 73 Fed. Cl. 532, 545 (2006).

Moreover, the "partial rescission" plaintiff requests is a logical impossibility. There may be a "partial rescission" of a divisible contract, *First Nationwide Bank v. United States*, 51 Fed. Cl. 762, 769 (2002), but contracts are presumed to be indivisible, *Stone Forest Indus. v. United States*, 973 F.2d 1548, 1552 (Fed. Cir. 1992). Plaintiff has not shown how this contract is divisible, but merely seeks to rescind her consideration (the resignation), while retaining the $90,000 the Government paid her. Under the doctrine of election of remedies, *Old Stone Corp. v. United States*, 450 F.3d 1360, 1374 (Fed. Cir. 2006), the plaintiff may either sue for damages for breach or rescind the contract, but if she rescinds, she must put the defendant in the *status quo ante*—that is, return the $90,000. *Republic Sav. Bank, F.S.B. v. United States*, 584 F.3d 1369 (Fed. Cir. 2009); *Aktieselskabet Dampskibsselskabet Svendborg v. United States*, 130 F. Supp. 363, 367 (Ct. Cl. 1955). The non-breaching party cannot be put in a better position than if there had been no breach, and any restitution must be reduced by the value of the benefits the plaintiff received. *Republic Sav. Bank*, 584 F.3d at 1378-79; *see also First Annapolis Bancorp, Inc. v. United States*, 89 Fed. Cl. 765, 811 (2009). Absent repayment of the $90,000, no rescission could be granted, even if it were within the Court's jurisdiction to do so.

Although the Court cannot adopt plaintiff's principal theory, in prior filings Ms. Greenhill sought ordinary breach of contract damages for the loss of the DOJ job. The Government objects to an award of these expectancy damages on the ground that the Court "cannot grant monetary relief for the loss of a position to which a federal employee has not been appointed." *Westover v. United States*, 71 Fed. Cl. 635, 640 (2006). In *Westover*, the plaintiff was, as here, seeking reinstatement and back pay. In that case, the plaintiff had not alleged or proven that he lost a job he applied for due to the Government's failure, in breach of a settlement agreement, to provide

neutral references. Judge Christine Miller acknowledged that if plaintiff had offered such proof (as Ms. Greenhill has in this case) then "the court could fashion a remedy for the plaintiff." *Id.* The requested damages would not be assessed against the DOJ, as it would if the DOJ had committed some wrongful employment practice. The question is instead whether the DOE breached its obligations under the settlement contract, with the loss of the DOJ position constituting the measure of contract damages. That is, for the purposes of assessing damages, it does not matter whether the position Ms. Greenhill failed to obtain was with the DOJ or an entity in the private sector; the point is that the DOE's breach of contract cost Ms. Greenhill the benefit of her bargain for which she is entitled to recompense.

        2.      <u>Mary Brayboy's Statements Proximately Caused Ms. Greenhill's Damages</u>

Defendant maintains that the DOJ could have obtained truthful information regarding the settlement by requesting the non-redacted files, and Ms. Cornett stated that she did not rely upon the false information Ms. Brayboy provided in declining to hire Ms. Greenhill. Thus, says defendant, any breach by Ms. Brayboy was not the proximate cause of Ms. Greenhill's loss of the DOJ position, and even if there were a breach, no damages are due. Oral Arg. Tr. at 48-49. Plaintiff counters that Ms. Brayboy was not allowed to lie, and that Ms. Cornett's actions after she received the false statements were "fruit of the poisonous tree." *Id.* at 69, 73. Plaintiff asserts that once Ms. Cornett was aware of Ms. Brayboy's criticisms, she heightened her scrutiny of Ms. Greenhill's application and viewed the information in her files with a more skeptical eye, resulting in withdrawal of her tentative selection for the DOJ job.

Ms. Cornett's testimony supports plaintiff's theory, in that after she read Ms. Brayboy's statements, she requested the OPF earlier than she otherwise would have, and reviewed the file with an eye to confirming or refuting Ms. Brayboy's representations. Tr. at 644-48. She reached the conclusion that Ms. Brayboy's remarks weren't "too far out of line with what the official personnel folder indicated, that there were employment difficulties . . . at the Department of Education." Tr. at 656.

Moreover, in 2004 the Government conducted a similar background check on Ms. Greenhill via the Department of Transportation for suitability for employment by one of DOT's contractors. That inquiry was conducted somewhat differently, with vouchers being mailed to previous employers rather than vouchering by telephone. Tr. at 568. In the absence of information from Ms. Brayboy, however, Ms. Greenhill was found suitable for employment. Tr. at 559. The Court therefore concludes that plaintiff has shown that defendant's breach of contract was a "but-for" cause and a "substantial factor" in causing those damages.

Ms. Greenhill's "tentative selection" by the DOJ supports her claim that she would have gotten the GS-5 secretarial job in the absence of a breach. The Court concludes that Ms. Brayboy's breach of the settlement agreement caused Ms. Cornett to accelerate her review of Ms. Greenhill's OPF, skeptically review it and draw negative inferences from the facially neutral information it contained.

       3.    <u>Plaintiff Is Entitled to Expectancy Damages in the Amount of $3,948</u>

      The goal of contract damages is "to put the injured party in as good a position as that party would have been in if performance had been rendered as promised." 11-55 CORBIN ON CONTRACTS § 55.3 (rev. ed. 2009). Contract expectancy damages are recoverable if they are "actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." *Bluebonnet Sav. Bank F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001). It was reasonably foreseeable that if the Government breached its promise to provide a neutral reference to a prospective employer (whether that employer was the United States or an entity in the private sector), the breach would cause Ms. Greenhill to lose that employment opportunity.

      Ms. Greenhill contends that her damages continued to run for several years, through the present day, and contends that she would have been entitled to various raises during that period of Government employment. The Government asserts that the breach did not cause damages beyond early 2003, when Ms. Greenhill received a raise at one of her subsequent jobs such that she was earning more than she would have if she had been employed at DOJ. The Government has the better of the argument.

      Ms. Greenhill had the burden to demonstrate that the damages she seeks were foreseeable at the time of contract formation.[11] *Landmark Land Co. v. Fed. Deposit Ins. Corp.*, 256 F.3d 1365, 1378 (Fed. Cir. 2001). She lost the opportunity to begin work in mid-2002 as a GS-5. After Ms. Greenhill's tentative offer of employment at DOJ was withdrawn in June of 2002, she collected unemployment benefits at approximately $300 per week for six months. Tr. at 468. She may also have worked for NAI Personnel as a contractor until December 2002, DX7 at 4, but in any event earned $8,195 in 2002 excluding unemployment compensation. DX12 at 3.

      In December of 2002, Ms. Greenhill obtained employment with Sunrise Assisted Living, where she worked as a security guard, administrative assistant and as a care manager. DX7 at 4; DX8 at 1; Tr. at 457. She worked full time during her entire tenure at Sunrise, starting at $10 per hour and later receiving a raise to $13 per hour. Tr. at 456-57. Defendant asserts that plaintiff was fired from Sunrise, but it is unnecessary to resolve that dispute. Whether Ms. Greenhill resigned or was fired, the move was not attributable to the breach, which suffices for the Court's purposes. Because $13 per hour was more than she would have earned had she been employed by DOJ, the chain of causation ends with her employment at Sunrise. There are a number of factual disputes regarding how and why Ms. Greenhill came to depart from her subsequent jobs, but for the purposes of determining damages, the Court looks only to what would have been foreseeable as following from the breach "in the ordinary course of events." *SGS-92-X003 v. United States*, 85 Fed. Cl. 678, 710-11 (2009). There is a minor decline in her salary from $13 to

---

[11] In this respect, plaintiff concedes there is no basis in the record to adjust the base rates of pay for the DOJ job or any of the jobs she actually held to account for the presence or absence of non-cash fringe benefits such as health insurance. Oral Arg. Tr. at 25.

$12.50 when she moved from Sunrise to a contractor to the Federal Railroad Administration, but that move was voluntarily undertaken.

If Ms. Greenhill had been hired on July 1, 2002 as a GS-5, Step 1 with DOJ, including the District of Columbia locality pay adjustment, she would have earned $12.15 per hour, with an annual salary of $25,347.  Thus, in 2002, she would have earned $12,673.  On January 1, 2003, the pay rate for a GS-5, Step 1 changed to $12.66 per hour, with an annual salary of $26,429.  From January 1, 2003 through March 1, 2003 (the approximate date she received a raise to $13 per hour at Sunrise), Ms. Greenhill would have received 59 days of the $26,429 annual salary, or $4,272.  For 2002 and 2003, therefore, the loss of the DOJ position cost Ms. Greenhill $16,945 in wages.

From this amount, however, the Court must deduct Ms. Greenhill's actual compensation from other sources.  It is unclear whether the $8,195 Ms. Greenhill earned in 2002 was before or after July 1, 2002, although her initial SF-85P indicates she worked for NAI Personnel from April 2001 to December 2002 and for Sunrise Assisted Living from December 2002 to May 2003.  DX7 at 4.  For purposes of this calculation, the Government estimates that $1,500 of these earnings occurred between July and December 2002, and in the absence of any contrary evidence from plaintiff, the Court adopts this estimate.

Ms. Greenhill also testified that she received unemployment compensation at approximately $300 per week for six months after DOJ withdrew its offer of employment.  Tr. at 468.  The Government estimates the total benefits received as $7,800, and plaintiff has not disputed this calculation.  As of January 1, 2003, Ms. Greenhill was employed by Sunrise Assisted Living at $10 per hour.  Between January 1 and March 1, at forty hours per week and ten dollars per hour, Ms. Greenhill earned $3,371 in 2003.

Adding the $1,500 in 2002 earnings, the $7,800 in unemployment compensation, and $3,371 in 2003 earnings, Ms. Greenhill actually received $12,671 between July 2002 and March 2003.  The difference between what Ms. Greenhill would have received, $16,945, and what she did receive, $12,671, is $4,274.  The Government further contends, with no contrary evidence from plaintiff, that this amount must be reduced by 7.65 percent for Medicare and social security taxes.  Def.'s Proposed Findings at 46.  Subtracting $326 to account for these taxes, Ms. Greenhill is entitled to $3,948 in contract damages for the Government's breach of her settlement agreement.  These calculations are summarized in the following chart.

|  | 2002 | 2003 | Total |
|---|---|---|---|
| **Income Lost from Withdrawal of DOJ Position** | $12,673 | $4,272 | $16,945 |
| **Ms. Greenhill's Actual Earnings from Work and Unemployment Compensation** | $9,300 | $3,371 | $12,671 |
| **Difference Between Income Lost and Actual Income** |  |  | $4,274 |
| **Minus 7.65 % for Medicare and Social Security Tax** |  | ($326) | **$3,948 TOTAL DAMAGES** |

## CONCLUSION

For the reasons set forth above, the Court finds that the Government breached its settlement contract with plaintiff Frances Greenhill, and she is entitled to recover of and from defendant the sum of $3,948 as damages for defendant's breach of contract. The Clerk is directed to enter judgment in favor of plaintiff in the amount of $3,948.

The Court entered a protective order in this action on November 17, 2008 (docket entry 25). This opinion shall therefore be **filed under seal.** The parties shall review the opinion to determine whether, in their view, any information should be redacted prior to publication in accordance with the terms of the protective order. The parties shall file, within 10 days of the filing of this opinion, a joint report identifying the information, if any, they contend should be redacted, together with an explanation of the basis for their proposed redactions.

**IT IS SO ORDERED.**

       s/ George W. Miller  
       GEORGE W. MILLER  
       Judge